IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEFFREY R. STUMP** | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 02-CV-6955 |
| | : | |
| **RICHLAND TOWNSHIP, et al.** | : | |

<u>MEMORANDUM AND ORDER</u>

**Kauffman, J.**                                                                                             **July    12,  2005**

      Plaintiff Jeffrey R. Stump ("Plaintiff") brings this action against Defendants Richland Township ("the Township"), Richland Township Board of Supervisors ("Board of Supervisors"), and Supervisors Richard Orloff, Steven Tamburri and Patricia Keller (collectively "Defendants") alleging violations of the First Amendment, brought pursuant to 42 U.S.C. § 1983 (Count I) and the Pennsylvania Wage Payment and Collection Law (Count II). Defendants have filed a Motion for Summary Judgement ("Defendants' Motion"). For the reasons that follow, Defendants' Motion will be granted.

**I. Background**

      This First Amendment retaliation case concerns Plaintiff's termination from employment with the Township. The Board of Supervisors is the official governing body of the Township. Am. Compl. ¶ 6. Richard Orloff, Steven Tamburri and Patricia Keller were the Supervisors on the Board at the time of Plaintiff's termination. <u>Id.</u> ¶¶ 6-9. During the relevant time period, Plaintiff held several positions with the Township, including Assistant Manager, Zoning Enforcement Officer/Planning Commissioner, Fire Marshal, and Emergency Management Coordinator. <u>Id.</u> ¶¶ 17, 20.

### A. Plaintiff's Hiring and His Duties

As of the beginning of February 2000, Plaintiff worked as the Township Fire Marshal, Emergency Management Coordinator and Executive Director of the Richland Township Water Authority ("RTWA"). Am. Compl. ¶ 17. On February 10, 2000, the Township hired Plaintiff to work on the Planning Commission and as the Zoning Enforcement Officer/Assistant Manager, and Plaintiff continued in his capacity as Township Fire Marshall, Emergency Management Coordinator and Executive Director of the RTWA. Id. ¶ 24 and Exhibit A. The terms of his employment were reduced to writing in a letter dated February 10, 2000. Am. Compl. Exhibit A. Plaintiff began his employment in these new positions on February 14, 2000. Am. Compl. ¶ 25. Plaintiff had no policy making function or duties, but did implement the policies developed by the Board of Supervisors. Pl.'s Dep. at 109-11, 118-19. At all times Plaintiff was an at-will employee. Pl.'s Dep. at 193.

In his role as the Zoning Officer on the Planning Commission and as Fire Marshal and Emergency Management Coordinator, Plaintiff had exclusive responsibility for the day-to-day operations of these functions in the Township, and he regularly interacted with Township citizens. Pl.'s Dep. at 45, 52-80. These functions were important to the Township and many were important to public safety. Pl.'s Dep. at 42-82. The Board of Supervisors was ultimately responsible for these functions and depended on Plaintiff for their efficient day-to-day operation. Pl.'s Dep. at 80.

In 2000, the development activity in the Township was heavier than it had been in prior years. Pl.'s Dep. at 61-62. As the Zoning Officer, Plaintiff issued zoning permits or directed the developer to apply for a zoning variance. Pl.'s Dep. at 52-53. Plaintiff received 20-30 phone

calls per day from citizens concerning zoning issues and usually had two to three walk-in meetings with citizens per day. Pl.'s Dep. at 53-55. Zoning is an important function to the Township. Pl.'s Dep. at 58. There was no one other than Plaintiff who performed the zoning function in 2000. Pl.'s Dep. at 57. Plaintiff acknowledged that it was important that he have a good working relationship with the Board of Supervisors. Pl.'s Dep. at 68-69.

As a member of the Planning Commission, Plaintiff also had day-to-day responsibilities, including meeting with developers, discussing the building and zoning requirements, describing the development process, reviewing development applications and distributing plans. Pl.'s Dep. at 70-74. Plaintiff acknowledged that this planning function was important to the Township and that his role was necessary in the development process. Pl.'s Dep. at 74.

### B.      Plaintiff's Relevant Conduct and Termination

On July 10, 2000, then Township Manager Bruce Fosselman wrote a negative performance review of Plaintiff. See Performance Evaluation of Jeffrey Stump ("Performance Evaluation"), attached to Defendants' Motion as Exhibit C. Plaintiff was informed that he would have to improve his attitude and time management skills in order to retain his job, and that Mr. Fosselman believed that his attitude toward the Board of Supervisors had changed because he had not been asked if he was interested in the expected vacancy in the town manager post. Performance Evaluation at 2.[1] Mr. Fosselman further concluded that Plaintiff was frustrated with his work load, that "he spent time letting everyone (staff and Board of Supervisors included)

---

[1] Township Manager Fosselman submitted his letter of resignation in June 2000. Am. Compl. ¶ 38 and Pl.'s Dep. at 104-06. Mr. Fosselman's review was dated July 10, 2000, three days after he officially left the Township's employment. Am. Compl. ¶ 46. After Mr. Fosselman's resignation, the Township retained David Jones to serve as Interim Manager pending the hiring of a new, permanent Township Manager. Am. Compl. ¶ 38.

know how busy he was," and that he was becoming a source of irritation to those involved. Performance Evaluation at 1.

On July 13, 2000, the Interim Township Manager, David Jones, met with Plaintiff and, based on alleged performance and attitude problems, extended his initial six-month probationary status for an additional five months.  See Memorandum to Jeffrey Stump from David Jones, attached to Defendants' Motion at Exhibit D; Pl.'s Dep. at 163-66.  On July 17, 2000, Plaintiff responded to Mr. Fosselman's evaluation in a Memorandum to the Board of Supervisors.  Pl.'s Dep. at 256-57.  In this Memorandum, he accused the Board of engaging in a "personal vendetta" against him, threatened to disclose facts to prove that Mr. Fosselman's evaluation was false and coerced, and suggested that he would consider "other alternatives" if the Board did not adopt his proposed resolution of his negative performance review.  See Memorandum of Jeffrey Stump to the Board of Supervisors ("Plaintiff's Memorandum") at 3, attached to Defendants' Motion at Exhibit E.  Plaintiff specifically wrote:

> I am confident that a case can surely be made that Bruce [Fosselman] had a good reason to comply with someone's request to author such a scathing document ... [I]f the need would arise to prove this point, I am sure I can require the truth to be known.  If that occurs, then the cards will fall where they land.  And, if I am correct, it will not be pleasant for some people.

Id. at 1.  Plaintiff asserted that he believed that several incidents over the past month had caused a breakdown in his relationship with some of the supervisors.  Id. at 2-3.[2]  Plaintiff speculates

---

[2]     Plaintiff specifically claimed this breakdown was attributable to: (1) a conflict of interest with respect to the new interim manager, David Jones; (2) the unscheduled appearance of a representative of the Pennsylvania Department of Environmental Protection ("DEP") at a Board of Supervisors meeting; and (3) a zoning concern with Ken Carr, a friend of Supervisor Orloff. Id. at 2-3.  These events are different than the events that Plaintiff relies upon as protected speech in his First Amendment claim.

that Mr. Fosselman would not have written the negative evaluation prior to these events, and concludes that the Board should accept his proposed resolution of the situation or he "will need to consider other alternatives where the facts can be resolved." Id. at 1-3. Plaintiff demanded as part of his solution that he be paid overtime hours pursuant to an alleged oral agreement. Id. at 3-4.

Disregarding the reasons stated in his July 10, 2000 Memorandum, Plaintiff claims in this litigation that the "turning point" in his relationship with the Board of Supervisors occurred during two earlier private conversations: one with Supervisor Orloff on June 27, 2000 and another with Supervisor Tamburri on June 29, 2000. Am. Compl. ¶¶ 29-46; Pl.'s Dep. at 108-21, 125-26, 133-34, 172. Plaintiff's alleged protected speech relates to these two conversations in which he questioned: (1) alleged improprieties by Supervisor Keller, such as the use of a Township cell phone for personal purposes and the receipt of a ride to a Township meeting in a police car;[3] (2) the holding of certain Board of Supervisor meetings in private which may have violated Pennsylvania's Sunshine Act, 65 P.S. § 701, et seq.; and, (3) the possibility that donations to the Township from developers whose applications for development were pending were a quid pro quo for the approval of their development projects, and in violation of the Pennsylvania Municipal Planning Code, 53 P.S. § 10101, et seq. ("MPC"). Am. Compl. ¶¶ 29-

---

[3] In his response to Defendants' Motion, Plaintiff states he "came to realize that the issues concerning Supervisor Keller were insignificant and not worthy of public concern and [he] dropped the matter ... Thus [his] discussion concerning Supervisor Keller is not the speech at issue for which [he] claims he was terminated." Plaintiff's Response to Defendants' Motion at 9 n.4. However, Plaintiff included these issues in his Amended Complaint. Am. Compl. ¶ 40.

46; Pl.'s Dep. at 108-21, 105-06, 133-34, 172.[4]

On or about July 18, 2000, Plaintiff and Township Manager Jones began discussing a change in Plaintiff's employment status; these discussions continued over the next few weeks with Mr. Jones and Lincoln Treadwell, the Township Solicitor.  Pl.'s Dep. at 167, 169-71, 176-94.  Ultimately, the Township offered Plaintiff a separation package, and insisted that he resign from all Township positions other than Executive Director of the RTWA.  Pl.'s Dep. at 191-92.  Plaintiff rejected this proposal.  Pl.'s Dep. at 193.  On August 28, 2000, the Township terminated Plaintiff's employment.  Am. Compl. ¶ 54.  The Township issued a press release discussing the reasons for Plaintiff's termination, and Mr. Jones wrote an evaluation of Plaintiff outlining his performance deficiencies.  See Am. Compl. ¶ 55; August 28, 2000 Press Release attached to Defendants' Motion at Exhibit G; Mr. Jones's Evaluation of Plaintiff attached to Defendants' Motion at Exhibit H.

**II. Legal Standard**

In deciding a motion for summary judgment pursuant to Rule 56, the test is "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law."  Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994)).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The Court must examine the evidence in the light most favorable

---

[4] Plaintiff does not allege that any supervisor benefitted personally from the alleged donations.  Pl.'s Dep. at 232.

to the non-moving party and resolve all reasonable inferences in that party's favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "there can be 'no genuine issue as to any material fact'... [where the non-moving party's] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Further, a plaintiff cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather must present evidence from which a jury could reasonably find in his favor.  See Anderson, 479 U.S. at 248.

**III.  Analysis**

    **A.   Count I – First Amendment Claim Brought Pursuant to 42 U.S.C. § 1983**

Plaintiff claims that Defendants, in their official capacity acting under color of state law and pursuant to official Township practice and policy, fired him in retaliation for his exercise or attempted exercise of his First Amendment rights.  Am. Compl. ¶¶ 64-70.  A First Amendment retaliation claim for a public employee is governed by a three step analysis: (1) the employee must demonstrate that the speech was protected; (2) the speech must have been a substantial or motivating factor in the alleged retaliatory action; and finally, (3) the employer can defeat the claim if it can show that it would have taken the adverse action even if the employee had not engaged in the protected conduct.  Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004) (citations omitted).  The second and third prongs are questions of fact, which must be left to the jury, while the first prong is a question of law that may be decided on a motion for summary judgment.  See id.

Within the first step of the three-pronged analysis, to qualify as speech protected by the First Amendment, the alleged speech must be: (1) on a matter of public concern and (2) the public's interest favoring a plaintiff's expression must not be outweighed by any injury the speech could cause to the employer's interest in promoting the efficiency of the public service it performs through its employees. Pickering v. Board of Ed., 391 U.S. 563, 568 (1968); see also Curinga, 357 F.3d at 312. While it is essential that public employees be able to speak out on questions of public concern without fear of retaliatory dismissal, "the State has an interest as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Pickering, 391 U.S. at 572. In determining whether the speech of an employee deserves constitutional protection, this Court must strike a "balance between the interests of the [employee], as a citizen, in commenting on matters of public concerns, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id.

Although the speech involved certainly included matters of public concern, the Court finds that the balance of interests of the employee in commenting on matters of public concern and that of the Township in promoting the efficient provision of public services heavily weighs in favor of the Township.

1. Matter of Public Concern

An employee's speech addresses a matter of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993) (citing Connick v. Myers, 461 U.S. 138, 146 (1983)). In determining whether speech is a matter of public concern, the Court

must consider "the content, form, and context of a given statement as revealed by the whole record." Connick, 461 U.S. at 147-48. The content of the speech may involve a matter of public concern if it attempts "to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." Baldassare v. New Jersey, 250 F.3d 188, 195-96 (3d Cir. 2001) (citing Holder, 987 F.2d at 195) (holding the plaintiff's speech was a matter of public concern where the plaintiff, an investigator, was directed by his supervisor to perform an internal investigation into alleged criminal wrongdoing by officials in the Bergen County Prosecutor's Office). The speaker's motivation is relevant to the extent that it indicates whether the speaker is speaking as "a citizen upon matters of public concern" or as an employee "upon matters only of personal interest." Versarge v. Township of Clinton, 984 F.2d 1359, 1364 (3d Cir. 1993) (holding the defendant fire company's interest in efficient service outweighed the plaintiff's interest in speaking out on alleged building code violations).

The courts have found speech by public employees criticizing their employer's policies and practices to touch upon matters of public concern. See Watters v. City of Philadelphia, 55 F.3d 886, 894 (3d Cir. 1995). Speech that an employer is "not discharging its governmental responsibilities" or that "seek[s] to bring to light actual or potential wrongdoing or breach of the public trust" are examples of when speech is more likely to be of a public concern. Connick, 461 U.S. at 149. However, if speech is merely an extension of individualized grievances, it is not protected. See id. (stating that "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs"); Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir. 1983) (speech disclosing public officials' misfeasance is protected while speech intended to air personal grievances is not).

In the present case, Plaintiff claims the context of the alleged protected speech was simply an attempt to inform and advise the Board about these issues. Plaintiff's Response to Defendants' Motion at 13-14. On its face, Plaintiff's speech concerning alleged violations of the Sunshine Act and the MPC implicates public concern.

The content of Plaintiff's speech is not determinative of whether the speech involves a public concern; the context and his motivation are other factors to be considered, and involve a consideration of the whole record. Versarge, 984 F.2d 1365; Connick, 461 U.S. at 148; Zamboni v. Stamler, 847 F.2d 73, 78 (3d Cir. 1988). Plaintiff did not raise his concerns until after David Jones – not Plaintiff – was hired as interim Town Manager. The fact that Plaintiff waited to express his concerns suggests the speech was of less significant public concern. See Connick, 461 U.S. at 154 (recognizing as significant that speech "emerged after a ... dispute" between the plaintiff and the defendant); see also Versarge, 984 F.2d at 1365. Further, this speech arose in the context of an admitted breakdown in the relationship between the Plaintiff and the Board of Supervisors. Thus, Plaintiff's alleged protected speech occurred in a context of personal grievances and disagreements between the Board of Supervisors and Plaintiff, as evidenced by his July 17, 2000 memorandum. Cf. Connick, 461 U.S. at 146-47.

The mere fact that an employee's statement is an outgrowth of a personal dispute does not prevent some aspect of the statement from touching on aspects of public concern. Johnson v. Lincoln Univ., 776 F.2d 443, 451 (3d Cir. 1985) (noting that neither the internal nature of the forum of the communication nor its tone controls whether or not speech touches on public

concern, but may be considered in the balancing test).[5]  The Court finds that the overall context and content of the alleged protected speech, and Plaintiff's motivation for the speech, support the contention that Plaintiff's speech was of public concern under Pickering.

    2.       Balancing of Interests

Plaintiff's speech does not, however, meet the Pickering balancing test outlined earlier in this analysis.  The Pickering balancing test requires full consideration of the employer's interest in the efficient and effective fulfillment of its responsibilities to the public.  See Connick, 461 U.S. at 150.  While "[t]he public has a significant interest in encouraging legitimate whistleblowing so that it may receive and evaluate information concerning the alleged abuses of ... public officials," O'Donnell v. Yanchulis, 875 F.2d 1059, 1062 (3d Cir. 1989), this interest must be weighed against the municipal employer's interests.  Versage, 984 F.2d at 1366.  The municipal employer's interests include whether the speech: (1) impaired discipline by superiors; (2) impaired harmony among co-workers; (3) had a detrimental impact on close working relationships for which personal loyalty and confidence are necessary; (4) impeded the performance of the speaker's duties; or (5) interfered with the regular operation of the enterprise.  Id. (citing Rankin v. McPherson, 483 U.S. 378, 388 (1987)).  The balancing test also considers the extent of authority entailed in the employee's position.  Id..

These employer's interests and factors are collectively referred to as "disruption."  Id.  While some disruption may be expected in any case where a government employee has broken rank, see Czurlanis v. Albanese, 721 F.2d 98, 105 (3d Cir. 1983), disruption must be balanced

---

[5] Because Plaintiff's speech was at the least in part motivated by personal animus and self-interest, the speech involves a private dispute rather than being purely an issue of public concern.  See Connick, 461 U.S. at 148.

against Plaintiff's interest and the public's interest in Plaintiff's speech. See O'Donnell, 875 F.2d at 1062. The context in which the disruption occurs is an important consideration "in determining whether speech that actually touches upon a matter of public concern is, in fact, a protected activity." Johnson v. Lincoln Univ. Of Commw. Sys. of Higher Educ., 776 F.2d 443, 453 (3d Cir. 1985).

"When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate," and it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking actions." Connick, 461 U.S. at 151-52; Green v. Philadelphia Hous. Auth., 105 F.3d 882, 887 (3d Cir. 1999) (stating that if the plaintiff's speech could potentially disrupt the work of the department, and this potential for injury outweighs the public's interest in the plaintiff's speech, then judgment for the defendant is proper). "When a[n employee] personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." Id. at 153.

In this case, Plaintiff threatened to publicly disclose allegations with respect to the zoning and development processes in the Township if his personal demands were not met. Pl.'s Dep. at 108-21, Plaintiff's Memorandum. These were the areas of responsibility for which he was employed by the Township, and he was the only person in the Township who performed his functions regarding zoning and development. Pl.'s Dep. at 45, 52-80. Plaintiff's threats thus created the potential for disruption and impaired efficiency and were detrimental to his relationship with the Supervisors and other township officials. See Pl. Dep. at 226-29.

Additionally, Plaintiff's level of responsibility in the municipal organization, his high level of public contact in his job and his admission that maintaining close working relationships with the Supervisors was important in order to perform his functions, confirm the potential for disruption caused by his speech.  See Pl.'s Dep. at 45, 52-80; see also Curinga, 357 F.3d at 307 (upholding ruling that dismissal did not violate a municipal employee's First Amendment rights where the employee was responsible for the administration of certain municipal affairs and running the day to day business operations of the defendant city).

Although Plaintiff's alleged protected speech was limited to in-house conversations with two Supervisors, the potential for disruption was ultimately high as he had a close working relationship with the Supervisors, he had constant access to the public, and was entrusted with the application of Township policies as developed by the Board of Supervisors regarding zoning and development.  See Walker v. City of Camden, 57 Fed. Appx. 943, 946 (3d Cir. 2003) (holding that plaintiff's speech critical of the Mayor's administration passed the balancing test where it was limited to in house conversations and was on issues of public concerns but noting that Plaintiff was a temporary employee, not a high ranking official, not the alter ego of the Mayor and had very limited access to the public).

Plaintiff was expected to carry out the zoning and development policies of the Board; dissent and disagreement with the policies would hamper the efficient working of the municipality.  Further, his speech came at a time when Plaintiff's relationship with the Supervisors was breaking down due to personality, attitude and time management problems. Proximity within an organizational hierarchy is a significant factor in the employer's demonstration that a public employee's speech has a detrimental impact on a necessarily close

working relationship. See Czurlanis, 721 F.2d at 106 (noting the "crucial variant" in the Pickering balancing test is hierarchical proximity). Plaintiff's behavior, threats, and demands destroyed any proper work relationship with the Board of Supervisors. Further, his intrusion in the decision making process of the Board constituted conduct that could only have had an adverse effect on the discharge of their duties. See Swineford v. Snyder County, 15 F.3d 1258, 1273 (3d. Cir. 1994).

The limited First Amendment interest involved here does not require that Defendants tolerate action that they reasonably believed would disrupt the efficient fulfillment of their responsibilities to the public, undermine their authority and destroy close working relationships. Plaintiff's speech thus fails the Pickering balancing of interests test and is not protected under the above analysis. Accordingly, summary judgment for Defendants is appropriate on this Count.

### B.  Count II – Wage Payment and Collection Law

The Pennsylvania Wage Payment and Collection Law ("PWPCL") provides a vehicle through which an employee may collect wages owed to him or her from a delinquent employer. See 43 Pa.C.S. § 260.1, et seq. The PWPCL defines an employer as "every person, firm, partnership, association, corporation, or receiver ... employing any person in this Commonwealth." 43 Pa.C.S. § 260.2a. Courts have determined, however, that the PWPCL does not apply to entities such as boroughs, school districts, counties and municipal employers. See Huffman v. Borough of Millvale, 591 A.2d 1137, 1138-39 (Pa. Comm. 1991) ("there is a clear distinction between municipal and private corporations and, if the legislature wished that municipal corporations be covered by the Law, it could have easily included them"); Ziegler v. County of Bucks, 1992 WL 129643, at *12-13 (E.D. Pa. June 8, 1992) (granting the defendant


county and county employees' motion for summary judgment because the PWPCL does not apply to municipal corporations); Phillipsburg-Osceola Educ. Ass'n v. Phillipsburg-Osceola Area Sch. Dist., 633 A.2d 220, 223 (Pa. Comm. 1993); Gallagher v. Goldsmith, 213 F. Supp. 2d 496, 499 (E.D. Pa. 2002).  Because Defendants are a municipality and its employees, summary judgment will be granted on this Count.

## IV. Conclusion

Based on the above analysis, the Court will grant Defendants' Motion for Summary Judgment on all Counts.  An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEFFREY R. STUMP** | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 02-CV-6955 |
| | : | |
| **RICHLAND TOWNSHIP, et al.** | : | |

## ORDER

**AND NOW**, this 12th day of July, 2005, upon consideration of Defendants' Motion for Summary Judgment (docket no. 50), Plaintiff's Response thereto and Defendants' Reply, it is **ORDERED** that Defendants' Motion is **GRANTED**. Accordingly, judgment is entered in favor of Defendants and against Plaintiff on all counts. It is **FURTHER ORDERED** that the Clerk of the Court shall mark this case **CLOSED**.

BY THE COURT:


 S/Bruce W. Kauffman
 **BRUCE W. KAUFFMAN, J.**